## SMITH & a. *v.* TOWN OF CONWAY.

If a terminus be described in a petition for a road as, "at or near the old fordway," and the commissioners lay out a road commencing "near the old fordway," at a point which it designates more particularly, it will be intended to be the same point referred to in the petition; and if the location of the road is certain, evidence will not be admitted to prove that it is seventeen rods from the old fordway.

A bridge which is private property may be taken for a highway, and damages lawfully assessed for it by the road commissioners.

The offer of a land-owner, to permit his land to be taken for a highway for a reduced price, if not actually an inducement in the minds of the commissioners to lay the road, will not be a sufficient cause for setting aside their report; and it will not, in the absence of proof, be presumed that they acted upon such inducement.

PETITION for a public highway in Conway, filed April term, 1844, and referred to the road commissioners, October term, 1844. The road commissioners gave the requisite notices, examined the premises, and heard the parties in October, 1844, and at May term, 1845, reported against

laying out the highway prayed for. At the same term the petition was referred to the new board of road commissioners, who heard the parties in September, 1845, and at November term, 1845, reported in favor of laying out the highway prayed for, and assessed damages in the sum of twenty-one hundred dollars, to be paid by the town of Conway, as follows : fourteen hundred dollars to John Smith, and seven hundred dollars to Joel Eastman. The highway was laid out over land of John Smith, the first petitioner, and over land of Joel Eastman, to whom the damages were awarded. After May term, 1845, and before September, 1845, when the hearing was had by the commissioners, Smith and Eastman, at their own expense, and without any consent or agreement with the town of Conway, or their selectmen, built a bridge on the route prayed for, which was taken by the commissioners, as a part of the highway, and by them appraised, and constituted the principal part of the damages by them assessed.

No application had been made to the selectmen to lay out the highway, except on the fifteenth day of March, 1844.

The town of Conway objected, that, under this state of facts, the road commissioners had appraised the bridge as a part of the highway, and that the town of Conway was not liable to pay for the same ; which objections were overruled by the court.

The town offered evidence tending to prove that during the hearing before the commissioners in September, Obadiah Stoddard, one of the road commissioners, stated that Eastman had said that the bridge had cost him and Smith three thousand dollars, and Conway should have it for two thousand dollars — as tending to show that said offer had an influence on the mind of the commissioners, in favor of laying out the highway. This was uncontradicted by that commissioner, but the other two testified that they were not induced to lay out the way by such

offer, or any other consideration than the public good; and the court ruled that the offer was not a sufficient reason for setting aside the report, and refused to do so, for that reason.

The petition was for a road, to commence " on the north side of Saco river, at or near the old fordway, so called, thence running across said river, and terminating on the south side of said river, at or near the road leading across the farm of Joel Eastman."

The town of Conway offered to prove that the said old fordway and the north end of said bridge were both at the north bank of the Saco river, and at the same place.

The court rejected the evidence. The court also declined to hear and consider evidence tending to show that the terminus adopted by the committee was seventeen rods from the fordway, for the reason that it appeared by the report to be the same denoted in the petition, and to be near the fordway.

*Emerson* and *Hobbs*, for the defendants, urged that evidence tending to show that the road was not located according to the petition, was admissible. *Miller* v. *Silsbee*, 8 N. H. Rep. 474.

*Lyford*, for the petitioners.

GILCHRIST, J.   This petition prayed for a public highway, to be laid out "from the north side of the river Saco, at or near the old fordway, across the river, and terminating on the south side of it, at or near the road leading across the farm of Joel Eastman."

Upon this petition the commissioners have laid a road from "the middle of the traveled path of the existing highway, near the old fordway," by courses tending southwardly, "to the bank of the river; thence across it to the centre of the highway now leading across the farm of Joel Eastman."

The courses and distances between the *termini* are not indicated in the petition, and they should not be indicated.

In the report of the commissioners they are given in order that it may be known where the new road is to be made; for the commissioners are not bound to lay the road in a strait line, but to order such deflections as the face of the country seems to them to render proper.

The question to be considered, upon comparing the petition and the report, is, whether the same *termini* are described in each, and whether the report follows the petition, and lays out the road or part of the road prayed for, or whether, on the contrary, it lays out one that cannot be fairly embraced in the descriptive part of the petition. In the latter alternative the report is bad.

The two papers, if we confine ourselves to such parts as we have cited, describe the *termini* nearly alike. In each, the proposed road begins at or near the old fordway, and ends on the opposite, or south side of the river; according to the petition, at or near the road crossing Mr. Eastman's farm, while the report terminates it in the centre of that highway.

Upon looking further into the report, however, it appears that the north terminus was some seventeen rods from the bank of the river, and the south terminus thirty-four rods from the river. There does not appear to be an objection to the last named terminus, as being differently described in the two papers, or as being in fact a different thing in the two papers.

As to the northerly, or first terminus, it would be impossible for the court, upon reading the papers, to say whether it was near the old fordway or not. If by "fordway" is meant a way leading to the ford, the terminus was exactly in it, as would seem. If another point was meant, the commissioners, by using the same language with that used in the petition, have, we must presume,

intended the same thing; and their report discloses nothing to indicate, that, in using the word " near," they meditated an abuse of the latitude of which the term admits, in construction.

If evidence were admitted to show that the old fordway was really seventeen rods distant, it would perhaps be unjust to presume that the point adopted by the commissioners was not, after all, the one intended by the petitioners. Is the fordway a fixed monument, or does it advance and recede according to the height of the river? and if so, to what extent?

The case of *Miller* v. *Silsbee* is cited, to show that the court should have heard the evidence. But the evidence there was admitted for the purpose of showing where the road was. In this case there is no such question. The road is so well fixed that counsel come prepared to show that it is not where the petition placed it.

In short, the commissioners say that the spot designated was near the old fordway, and the defendants say that they can prove that it was not near the old fordway. We think that it may safely be presumed that the commissioners, on arriving at the place, were able to find the terminus named in the petition, and took their departure from it.

We see nothing in the report to indicate that this highway was laid over another, and that damages have been awarded to land-owners for what they had already dedicated to the public use.

If, as was offered to be proved, the end of the bridge was at the fordway, the persons who built the bridge upon their own land did not the less own it that the bed of the river was subject to the servitude of a ford.

If a structure, placed there for any private object, obstructed a public way, there were measures within the reach of such as desired to use them, to have it removed. But it was not the less the property of those who so

encroached upon the public way, and it was not the less property which might well have been taken for public use.

The evidence offered, however, was not such as to raise the question, apparently; since it was to show only that the fordway and the north end of the bridge were in the same place.

The property taken, so far as can be gathered from the report or from the offered evidence, was not that part of the old road which had been used for a ford, unless we are bound to such an inference from the end of the bridge being at the fordway. The bridge was built by Messrs. Smith and Eastman upon their own ground, and, as has been said, was their property. It was real estate, being annexed to the land, and, like any other real estate or thing affixed to the soil, whether tree, house or wall, subject to be taken by the road commissioners for the public use. *Pierce* v. *Somersworth,* 10 N. H. Rep. 375. "A building," it was there said, "has no greater immunity than a fence. Each is a structure erected or maintained by the owner for the purposes for which it is appropriate ; but there is nothing in the use or in the nature of the property to exempt it from the public servitude, or the power of eminent domain."

We are unable to distinguish the bridge in dispute by any feature which should remove it from the scope and force of the reasoning of the court concerning the building in the case referred to, and conclude that the exception is not a well founded one.

It is said that the report is bad because Mr. Eastman had, in the presence of the commissioners, and to induce them to lay the road, said that the town of Conway might have the bridge which he and Smith had built for somewhat less than it cost.

When commissioners deliberate upon the expediency of laying out a highway, two principal questions ordinarily

present themselves, and are urged with all the force that becomes parties debating upon such subjects. One question relates to the need which the public has of the accommodation which the road would yield. The other, to the burden which the construction of it would entail upon the towns whose duty it would become to build it if laid out. These are lawful inquiries, and exactly such as men of common sense always make; and they resolve themselves into the general question of sound expediency. If, upon comparing a great public want in respect to the highway, with the great expense of construction, there is, as often there will be, a doubt in the minds of judicious men as to what their duty requires them to decide; then, if one or more individuals, desirous of promoting with their wealth the public improvement in question, offer to contribute a part of the estimated expense; to pay, for instance, the amount of land damage, or, being themselves land-owners, offer to remit a part of what they may be entitled to as damages; and if the committee thereupon, and under the influence of such a proposition, lay out the road, their proceedings are held to be irregular, and will be set aside by the court. *Dudley* v. *Cilley*, 5 N. H. Rep. 558; *Dudley* v. *Butler*, 10 N. H. Rep. 281.

It appears that an offer was made by Mr. Eastman, one of the owners of the bridge, to permit it to be taken for the proposed highway, for a sum of money below its alleged cost. But two of the commissioners have, by furnishing affidavits, obviated any inference that might possibly have been drawn from the fact that such an offer was made; and as to the other, the court will not presume him to be ignorant of the decisions of the court on this subject, or regardless of his duty. The court will not presume that such an offer has been acted upon; and there appears, in the mere knowledge that it has been made, nothing that should vitiate the proceedings. There appears to be no sufficient reason why the report should not be accepted. *Report accepted.*